. Today's cases will be called as previously announced and the times will be as allotted to council. The first case today is number 171104 United States v. Jose Ignacio Goris. Mr. Mann. May I ask the Black and Grish to manage the room while I do this? You may. Good morning. I represent Mr. Goris who is the defendant in a one count drug charge which alleged that he attempted to possess 500 or more grams of cocaine. He was convicted of that and sentenced to the mandatory minimum of five years. Basically from a period of about May of 2014 through August of 2014 Mr. Goris was involved in a series of communications with undercover law enforcement agents. Virtually all if not all of those communications were memorialized usually with a tape recording of some kind or another. They culminated and during that period from May to August there were lots of conversations. The conversations can be interpreted in a number of different ways. The government says they represent attempts by my client to broker a large drug deal. Defense contends they were largely bluster. In the end what happens is that there is a meeting at a Lowe's hardware store between the defendant and an undercover agent Garcia. The recording of that meeting becomes a critical issue in this case. The parts of that recording are unintelligible and the defense hired an expert to analyze that recording. The defense expert was a retired Rhode Island State Trooper in charge of the computer fraud lab at the Rhode Island State Police. He did analyze that recording and when he analyzed that recording he came to the conclusion that there had been an edit of the recording. He based that on a spectrographic analysis of the recording that showed a significant drop in the noise level. After he received that recording and it took months to get that recording for whatever reasons, the defense filed a request for discovery and the defense basically sought access to not only the original recording but the devices that assisted in producing that recording, the computer devices, the storage devices, all those things. There was a hearing on that motion for discovery and the district court denied the request for discovery. That is one of the two major issues on this appeal. The court said that the request for discovery was not material and it basically said it's not material because this expert, Detective Bell, doesn't know much about this program, it's a new program, how can he testify about it? The court not only said that but the witness himself had testified that he was unfamiliar with the technology. He did say he was unfamiliar with the technology but he also said that he had examined lots of computer programs, lots of devices and one of the things that he specifically asked for was access to the original recording. And the reason that's so significant is this. If he had been given access to the original recording, he could have compared the hash values for the original recording with the hash value of the recording provided to the defense. Everybody knows that that was a way that you could do the comparison. Wasn't that already or otherwise established in the record though that the hash tag values in fact matched? That only became apparent about a week before the trial, Judge. And what actually was apparent at that point was that the hash value of the recording provided to the government was the same as the hash value of the original recording. Presumably the hash value that was provided to the defense would have been a copy of the one provided to the government. Now that we know that now after the fact and the fact that your expert was otherwise not familiar with the technology, then on what basis could we conclude that you satisfied the burden of establishing that it would be material, it would have been material for him to conduct the examination? I want to try to answer that. First he was familiar with the use of hash values. He testified about that, Judge. What happened in this case was that when he testified at trial, he still maintained that there was an edit of the recording. If he had access to the original recording and could have compared the hash values, there are two possibilities. One is that he would have concluded that there had not been an edit. That would have dramatically changed how this case was presented to the jury. He might have easily focused on other items related to the discovery. For example, the unintelligibility of any of the conversations. Why they did the conversation in a place like Lowe's where there were arguably significant environmental factors that could have impacted the clarity of the communications. Why they set it up in a way that... But all of those items were open to him at the trial. I mean he could have testified about anything you've just mentioned at the trial without examining anything. But what really happened was he had this opinion that there had been an edit. He wasn't able... He was cross-examined very effectively about that. If he had been given access to the original recording, he could have at least compared the hash values. That might have significantly affected his presentation. When you talk about how something can materially affect the defense, one of the ways it can affect the defense is in aiding the preparation of a witness. He would have been significantly better prepared if he'd been given access to this material. So I think all that points to how even if he didn't have familiarity with this precise technology, his ability to testify would have been enhanced. And he did testify he had familiarity with... Judge Selye has a further question. Just to refresh my recollection, this argument that you're making to us now about comparing the hash values with respect to producing only the original tape so you could compare the hash values, was that argument made to Judge Lisi at the time of the original motion? I think that... I don't recall anything in the transcript. That's why I'm asking. I know at one point the expert testified that he wanted access to the original... Yeah, but that's not the question I asked. I know. You're making an argument in support of materiality to us that I'm struggling to recall whether that argument was made to the district court because, of course, if it wasn't, that puts it in a different light. I just don't know the answer to that specifically. I'm sorry. Let me check the record. Thank you. Mr. Mann, on the other prong of this, which is the proprietary aspect of the technology, help me understand, in your view, was there anything in this record other than the fact that the technology was password protected and that it was privately owned? Is there anything in addition to those facts that support the notion that this is sufficiently proprietary as to be hands-off in discovery? Not that I'm aware of. In fact, the record is clear that the government sought to call the president of the company, Henry Boe, to testify in part about the hash tags but also in part about other things related to this testimony, to this program that was used. And in addition to that, they submitted an affidavit at the actual discovery hearing by Agent Garcia about what he knew about the program. So if there was anything else proprietary, it wasn't spelled out in the record. It seemed that it was just a regular sort of program that in some way stored these calls on a database on a computer. And that by itself would not be proprietary, it seems to me. And the government didn't spell out anything beyond that. The court, when they said it was proprietary, focused on the fact that it was new technology. But, in fact, even the government agents testified they knew very little about the program. I see my time is functionally a lot over. Thank you, Mr. Mayor. Good morning. Donald Lockhart for the government. On the question of materiality, the thing to notice right from the start is that we're dealing with a fairly unusual invasive defense discovery request. The defense apparently neither trusts the government nor even the private company to supply the quote-unquote original file in this case. And so the defense actually wants the right to go into the servers, computer media, related things in the private company's offices. If you look at docket numbers 30 and 69, the two pertinent defense filings, and you look at the defense argument at the hearing before Judge Lisi, that's clearly what they want. So right from the start we're dealing with a very unusual request. And if the defense pointed to something that was really material, maybe that would have justified it. But here we have a situation where right from the start the spectrograph analysis really says very little. It says that there was a drop in the audio. That drop is perfectly consistent with a drop in the cell phone signal. The district court judge, Judge Lisi, recognized that point at the hearing. Even Judge McConnell later alluded to that point later in the case. The defense expert came close to conceding the possibility, and the later proffer by the founder and president of the private company also pointed out that audio drops like this are just perfectly consistent with drops in cell phone signals, a weakness in the cell phone signal. When you add to that the hash value analysis that was ultimately done, it just doesn't seem like there's any margin left for claiming materiality unless you somehow posit from something in the record that we can't even trust the proffer given by the private company. And what I would submit is that, or what we would submit, is that there's nothing in the record, and the defense in the district court and now on appeal has never said anything to suggest that that proffer is in any way suspect. Mr. Lockhart, let me ask you about that. Is there a call, is it Mr. Bell? Yes. Mr. Bell testified that he, listening to it, he thought that the conversation where that break occurs, that the conversation didn't quite make sense, didn't work, suggesting that in fact perhaps there had been some audio deleted, actual recording deleted. Why wasn't that enough? He does say that, and yet when you look carefully at that portion of his testimony, he has a very hard time articulating why he says that's so. My recollection is he's not actually parsing out sentences, you know, from the audio transcript. He's just sort of making a conclusion without very much support behind it. But the fact that a conversation is disjointed perhaps, I mean, we've all seen cases like this where undercover agents are talking with people who want to buy drugs. They are inherently disjointed a lot of the time. I mean, this happens all the time. So the mere fact that some portion of the conversation doesn't flow perfectly doesn't really give the defense much of a leg up in showing materiality. If we were to conclude that the defendant did establish materiality, just hypothetically accept that for a moment, turning to the proprietary argument, would you still be arguing that the government still didn't take the position that it was non-discoverable because it was a privately owned technology? Yes, there are two further arguments. There's the alternative ruling of the district court on the proprietary nature of the technology, and then there's also the harmless error argument. So we're really advancing three arguments. On the second argument that you just mentioned, we do think that there was sufficient support in the record for Judge Leasy to conclude that this was proprietary technology based on the fact that even the defense expert conceded that it was new technology and by its nature apparently unique in the sense that it allows the cell phone to transmit audio to the database within the company and then get converted into a wave file. Now, there is no suggestion that there was some competing technology out there on the market, but even if there were, it seems very natural to conclude that this technology was being viewed suitably and unique so that it could be considered proprietary. But we're talking about... That's a rigorous doubt, though, and this is not my area, but it sounds like rocket science that there's a technology that you can use a cell phone that can then transmit a recording which is recorded by a device somewhere else. What's so unique about that? Well, I think we would resist the threshold point that because a particular software program is potentially easy or straightforward to devise, that that makes it not proprietary. I don't think the two things really follow. Anything that a company does that is new or unique, however easy it was for the company to create, could still be proprietary in nature. So the fact that it may not be rocket science, rather, to me or to us, does not resolve the question of whether it's proprietary. But the judge, to answer your question, was relying on two main pieces in the record before it at the time, and that is the affidavit of Agent Garcia, which is in the joint appendix, and on the concession made by the defense expert, Ken Bell, that this was, from his perspective, new technology. I would just note on this second issue before we leave it, that Rule 16 D1 allows a judge to deny an otherwise discoverable item if there is simply good cause to do that, and good cause has been defined as giving the judge, according to the Wright Treatise, vast powers. So even if you assume materiality, the judge still had very substantial discretion to decide that this very invasive discovery request was inappropriate. And it's not just the proprietary nature of the technology. It's also the invasiveness of the request itself. It's going into the servers and computer media of a private company. So you don't want to just focus on the newness of the technology. You want to look more broadly about the nature of this discovery request. Mr. Lockhart, I take it, though, that the government's position is that the district court was absolutely right in concluding that the materiality had not been established, and therefore there is no need to go into the developing law on new technology and proprietary information. Absolutely. The easiest point to resolve the case on is the materiality point, and frankly after that we would submit the harmless error argument. The second argument on the proprietary nature of the technology is really the one that would require more work on your part from our perspective, and so there's no need to address it if you can conclude either that it was immaterial or that any error was harmless. If there are no questions, we'll rest on our brief. Okay, thank you. Mr. Mann. I would just like to use a portion of the two minutes to respond to Judge Selye's question that I wasn't able to answer. On page 34 and 35 of the addendum, it's part of the transcript of the hearing before Judge Biese. Detective Bell has asked basically what would you be looking for if you were to compare the original recording with the recording you received, and he says in his answer, so there's something that's called hashing a digital file, and that's equivalent to like a fingerprint or DNA, so I could use specialized software that would create a digital fingerprint of that file, and if one, and he goes on to say basically explain how hashing works. That's helpful. Thank you, Mr. Mann. I would also point out that on page 23 of the addendum, which is still part of the same transcript, he was asked whether it was important to have access to the original conversation. Why? And he says because that would allow me to analyze the original audio recording against the audio recording that is on the state to determine what was actually altered. So I think there are at least two places in the record that I was able to quickly find that addressed that issue. Thank you. Thank you.